UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Stanhope A. Ford, | ) | No. 3:07-CV-01828 |
| | ) | |
| Plaintiff, | ) | [Hon. James G. Carr] |
| | ) | |
| v. | ) | MEMORANDUM IN OPPOSITION |
| | ) | TO DEFENDANTS' MOTION FOR |
| Owens-Illinois, Inc., Owens-Illinois | ) | <u>SUMMARY JUDGMENT</u> |
| Retirement Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

    Plaintiff Stanhope A. Ford submits this memorandum in opposition to defendants' motion for summary judgment. Simply stated, the record evidence raises genuine disputes of material fact as to whether the actions of defendants were in violation of ERISA duties, rendering summary judgment inappropriate. Factually, the argument that Owens-Illinois, Inc. ("OI") makes turns the law inside out, for it was OI which gave repeated and written assurances that the adoption of the Eighth Amended and Restated OI SRP plan ("Eighth Amended SRP"), solely under the control of OI, would not defeat Mr. Ford's rights.

    Wrapped as it is in elegant legalese, OI's argument is reduced to the premise that it can do indirectly with impunity what it cannot do directly. To facilitate its economic and financial interest in connection with the divestiture of its plastic products business, it assured incumbent management that early retirement benefits would remain available so long as they transitioned the company's business. When an intended reduction in early retirement benefits was announced as part of the Eighth Amended SRP, Ford sought specific assurance from the then Co-Chief Executive

Officer and General Counsel that the revised plan would not operate to his detriment. Provided with such written assurance, he continued his employment, only to be told then that he was in error, and to be told now, that such written assurance were "mistaken". If the canard about the parricide seeking mercy on the grounds that he was an orphan ever applied, it is spot on here.

OI entered into an agreement to continue an early retirement benefit as part of its Seventh Amended and Restated SRP. It then determined to withdraw the early retirement benefit, all the while assuring Ford that such amendment would not affect his particular rights under the prior plan and agreement. It seeks to escape liability for its broken promises, cutbacks, and misrepresentations by callously characterizing Ford as an avaricious plaintiff, demanding more. Glass walls must be crashing all over the site at the world's largest glass manufacturer, for it now asserts that its solemn promises can unilaterally be undone, and reliance on its confidence-assuring representations are simply mistakes for which a party has no claim for relief.

Plaintiff's claims are cognizable. OI is not entitled to judgment as a matter of law. Its motion for summary judgment should be denied.

## I. STATEMENT OF MATERIAL FACTS

This ERISA action asserts four claims arising from OI's breach of or deceptive misrepresentation about its December 16, 2003 letter agreement ("Letter Agreement") with plaintiff that induced him to remain as an executive with the company until the complete divestiture of its plastic products division. Essentially, Ford was assured that he would receive enhanced retirement benefits from OI, in accordance with its then existing Salaried Retirement Plan, under certain conditions, if he remained with OI. [Second Amended Complaint, ¶7-8, Exhibit B.] In complete reliance upon the Letter Agreement, Ford did so.

In late 2004, as a cost-cutting measure, OI determined to amend its Salaried Retirement Plan. [Deposition of Danny Pennywitt at 22-26.][1] Among the intended modifications

---

[1]The transcript of the deposition testimony, taken May 29, 2008, together with the documents authenticated at that examination, was filed with the clerk of courts on May 11, 2009. Pennywitt was the OI Director of Compensation Benefits, who was personally involved in the preparation of

2

was the elimination of the enhanced retirement benefits associated with reductions in force ("RIF"), the very benefit conferred by OI in its Letter Agreement. [Pennywitt Dep. at 28; Memorandum in Support, Eighth Amendment to the Plan, ¶4, p. 3, Exhibit C to Appendix 1, Meyers Aff.] Upon receiving notice of the intended amendment to the Salaried Retirement Plan, Ford sought assurances from OI that his right to the benefit had vested, and that he might retire at any time before September 30, 2006, and receive the benefits promised in the Letter Agreement. OI provided the express assurance by letter dated December 28, 2004. [Second Amended Complaint, ¶16, Exhibit D.] In specific terms, it assured him that:

> "1. You are correct in your understanding that subparagraph (2) on page 1 of your December 18, 2003 letter agreement (the 'Agreement') has been triggered.
>
> "2. Pursuant to the Agreement, you can retire at any time prior to 9/30/2006 and receive the RIF retirement benefits specified in the Agreement.
>
> "3. You do not need to take any action at this time to confirm or secure your rights under the Agreement.
>
> "4. In the event you were to retire before 9/30/2006, your RIF retirement benefit would be payable in the following manner (reflecting the 1/1/05 amendment of the Salaried Retirement Plan):
>
>> "a. a lump sum (if so elected) amount calculated as of 12/31/04 and payable in part from the Qualified Plan and in part from the Nonqualified Plan; and
>>
>> "b. an annuity amount calculated based on your final covered compensation and your service from 1/1/05 until your retirement date (a part of which annuity may likewise be paid from the Nonqualified Plan)."[2]

---

the critical agreements in this case, and who worked directly under the chief executive officer who signed them. [Pennywitt Dep. at 7-8, 14, 22-26, 32.]

[2]The December 28, 2004 memorandum explicitly assured Ford that he would be paid the benefits provided notwithstanding the January 1, 2005 amendment of the Salaried Retirement Plan.

The memorandum also assured Ford that he could, at any time prior to his retirement, obtain reasonable projections of his RIF retirement benefits under the Letter Agreement, which he in fact did. [Pennywitt Dep. at 39, 45-52; Second Amended Complaint, ¶18, Exhibits E and F.] The projections made by OI, as authorized by the December 2004 memorandum, confirmed that Ford would receive substantial tax advantaged benefits. Had Ford retired on or before December 31, 2004, he would have been entitled to the enhanced benefit. [Pennywitt Dep. at 62-65.] His reliance on the December 28, 2004 memorandum is indisputable.

When Ford retired from OI, he sought the benefits he had been promised, and was told that they were not available, as the Salaried Retirement Plan had been amended to eliminate RIF benefits. What OI promised in 2003, and specifically reaffirmed in 2004, was purportedly forfeited but four days later. Further, Pennywitt testified that OI must have known, and the executive subscribing the December 28, 2004 memorandum did in fact know, that the amended plan did not permit what the December 2004 memorandum promised. [Pennywitt Dep. at 41-42; 61, 68.] The written assurance, subscribed by the general counsel to OI, was deceptively inaccurate.[3]

In support of its position, OI argues that the written assurance of OI's then co-Chief Executive Officer and General Counsel, authored by OI's outside corporate counsel, "mistakenly informed" Ford that he did not have to retire before the Eighth Amendment became effective. [Memorandum in Support of Motion for Summary Judgment at 6.] The conclusion that the representation was a "mistake" references no affidavit to support it. Indeed, the only affidavit filed in support of the motion simply authenticates it. [Pamela Myers Affidavit,¶6.]

OI contends that it has paid Mr. Ford the "actuarial equivalent" of what he was promised. [Memorandum in Support of Motion for Summary Judgment at 7, Pamela Myers Affidavit,¶9.] That argument may be too clever by half, as it attempts to pull the rabbit from the proverbial magician's hat, by conflating "actuarial equivalent" with taxable equivalent. Ford was

---

[3]Pennywitt asserted that the December 28, 2004 memorandum assurances, and the benefit calculations made in 2005, all were mistakes. [Pennywitt Dep. at 49, 51-52, 55, 66-68.]

4

promised by OI a tax qualified distribution, that is, a distribution on which taxes would not immediately be realized, ranging from $995,872.06 to $1,017,279.11. [Deposition of Stanhope Ford, at 68-77, Exhibits 4 and 5.] Similar calculations were contemporaneously provided to Mr. Ford, and were marked at his Deposition as Exhibits A and B.[4] In the latter two exhibits, the Qualified Plan Benefit Lump Sum ranged from $894,585.47 to $942,855.01.

It is against this background that the charge of penuriousness must be tested. Mr. Ford was promised a tax-deferred distribution, upon retirement, ranging from nearly $900,000.00 to one in excess of $1,000,000.00. He received a non-qualified distribution of $537,799.64. [Memorandum in Support of Motion for Summary Judgment at 7, Pamela Myers Affidavit,¶9.] Does it not turn everyday financial planning concepts inside out to suggest that a non-qualified distribution, fully taxable on receipt, is the actuarial equivalent of a qualified distribution, on which taxes can substantially be deferred? Is this not even more apparent when the amount of the taxable distribution is slightly more than half of the nontaxable distribution?

The consequences of the OI action can hardly be considered inconsequential. Even Pennywitt conceded that the distribution, had it been made in 2004, would have been tax-advantaged, and that OI itself told Ford, long after the amendment to the plan had been implemented, that he was entitled to a tax advantaged distribution near or exceeding One Million Dollars ($1,000,000.00). [Pennywitt Dep. at 38-44, 47-55.] Instead of receiving a lump sum distribution in the approximate amount of One Million Dollars eligible for tax-deferred rollover to an individual retirement account, plaintiff received a lump sum payment of $573,799.64 which was not entitled to favorable tax treatment. [Memorandum in Support, Appendix 1, Meyers Aff. at ¶9.]

OI, in responding to these documented Second Amendment Complaint assertions, confirmed as they were by the sworn testimony of its then Director of Compensation Benefits,

---

[4]Exhibits 4 and 5, as well as Exhibits A and B, authenticated at the Ford deposition, are attached hereto for convenient reference.

contends that Ford has no ERISA claims cognizable at law, and that his suit should be dismissed on summary judgment. [Motion for Summary Judgment at 1; Memorandum in Support at 7-18.]

## II. APPLICABLE STANDARD

Pursuant to the Federal Civil Rules, summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-588 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986). The purpose of the rule is not to deny litigants their right of trial by jury where legitimate issues remain for determination. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944).

## III. ARGUMENT

A. OI Violated the ERISA Anti-Cutback Rule By Enacting The Eighth Amendment to the Plan Which Eliminated an Early Retirement Benefit Owed to Plaintiff.

The ERISA anti-cutback rule prohibits any pension plan amendment that reduces or eliminates a participant's "accrued benefit." ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1). In 1984, the anti-cutback rule was expanded to further prohibit by amendment the elimination or reduction of an early retirement benefit, retirement-type subsidy, or an optional form of benefit. 29 U.S.C. §1054(g)(2); *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 744, (2004). The rule "is crucial to ERISA's central object of protecting employees' justified expectations of receiving the benefits that they have been promised." *Cent. Laborers' Pension Fund* at syllabus (a). "[W]hen Congress enacted ERISA, it wanted to mak[e] sure that if a worker has been promised a defined pension benefit upon retirement — and if he has fulfilled whatever conditions are required to obtain a vested

6

benefit — he actually will receive it." *Id*. at 743, quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).

Assuming for the sake of argument that defendants are correct in their assertion that the RIF benefits at issue in this case are not "accrued benefits," because they are not annual benefits commencing at normal retirement age; it does not follow that, as promised to plaintiff, they were not early retirement benefits afforded protection by the anti-cutback rule. The case in which defendants rely in their memorandum argument specifically defines an early retirement benefit as "benefits that become available upon retirement at or after a specified age which is below the normal retirement age, *and/or upon completion of a specified period of service*." *Ross v. Pension Plan for Hourly Employees of SKF Indus., Inc.*, 847 F.2d 329, 333 (6th Cir. 1988) (emphasis added). Other courts have held that "once a participant meets the conditions of the early retirement benefit, a company may not amend its plans to reduce the participant's early retirement benefit." *Corley v. Commonwealth Indus., Inc.*, No. 3:07-CV-196-H, 2008 WL 5110963, at *2 (W.D. Kentucky Dec. 3, 2008) citing *Cattin v. General Motors Corp.*, 955 F.2d 416, 423-424 (6th Cir. 1992). Such a reduction or elimination would be a violation of ERISA § 204(g)(2). *Id*.

In the case at bar, plaintiff was expressly promised the RIF benefits upon his staying with OI until it could successfully sell its plastic products division. The duration of the time from when OI decided to sell the plastics division, until it ultimately did sell the division, is a "specified period of service." There is also no dispute that the plaintiff remained with OI until the plastics division was sold. Put another way, plaintiff satisfied the conditions placed on the benefit by the Letter Agreement, prior to the amendment to the plan. Clearly, OI's promise to pay enhanced retirement benefits was an early retirement benefit as defined by the Sixth Circuit. In the least, it is a question of fact that should be determined by a jury.

Defendants, of course, disagree with the above analysis. Instead, defendants argue that, under *Ross,* plant shutdown benefits are not early retirement benefits protected by the anti-cutback rule. The circumstances in *Ross*, however, are distinguishable from the facts in this case.

7

The court in *Ross* dealt with an amendment that reduced or eliminated plan benefits in the context of a plant shutdown. In the instant case, the enhanced retirement benefits were repeatedly promised to plaintiff in the context of retention benefits, and on the condition that plaintiff remain employed with the company for a specified duration of time. The Letter Agreement merely pointed to the RIF provision as a means to measuring or determining the amount of benefits plaintiff would receive if he chose to remain in his position with OI. Thus, despite defendants' insistence to the contrary, the holding in *Ross* is distinguishable from the instant dispute.

Even if plaintiff is mistaken, and the facts are not distinguishable, the holding in *Ross* is not absolute. See *Bellas v. CBS, Inc.*, 221 F.3d 517, 526-530 (3rd Cir. 2000) (discussing the split among federal courts regarding whether job separation benefits are accrued benefits afforded protection by the ERISA anti-cutback rule.) In *Bellas*, the third circuit court of appeals explicitly declined to follow the holding in *Ross*, and instead held that plant shutdown benefits that continue beyond normal retirement age may be either early retirement benefits or retirement-type subsidies, or both, so as to be accrued benefits protected by the anti-cutback provision of ERISA. *Id*. at 532-540.

> "[T]he concept that all plant shutdown benefits or any similar contingent benefit, cannot be a protected retirement-type subsidy runs contrary to the legislative history of section 204(g). * * * The *Ross* court, however, did not explain why, in the face of Congress's express intention, it chose to find that plant shutdown benefits never may be considered retirement-type subsidies. There is no discussion in *Ross* of whether the plant shutdown benefits there continued beyond normal retirement age. Accordingly, we believe that the *Ross* court's analysis of the issue does not provide a basis upon which to decide this matter."

*Id*. at 532.

Here, the plan provision at issue, §8.05, provides that "a Terminated Retiree shall be eligible for an Enhanced Retirement Benefit equal to the Terminated Retiree's Accrued Benefit subject to the following table by reason of the early commencement of such benefit." The plan does not stop payment of the benefits upon the participant reaching normal retirement age. Thus, and in

accordance with *Bellas* and legislative intent, the enhanced retirement benefits provided under §8.05 are the type of benefits afforded protection by the anti-cutback rule.

  B. <u>OI Violated Its Fiduciary Duties by Adopting and Implementing an Illegal Cutback in Violation of Section 404 of ERISA, and Plaintiff Has Standing Under ERISA to Bring a Direct Action for Breach of Fiduciary Duties.</u>

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]" ERISA § 404(a)(1) and (a)(1)(A)(i) and (ii); 29 U.S.C. § 1104(a)(1) and (a)(1)(A)(i) and (ii). The fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" ERISA §404(a)(1)(B); 29 U.S.C. §1104(a)(1)(B). A fiduciary must also act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter[.]" ERISA §404(a)(1)(D); 29 U.S.C. §1104(a)(1)(D).

"ERISA provides 'a panoply of remedial devices' for participants and beneficiaries of benefit plans." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989), quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985). ERISA's "Civil Enforcement" provision, for instance, provides that a civil action may be brought:

> "(1) by a participant or beneficiary–
>
>> "(A) for the relief provided for in subsection (c) of this section [providing for liquidated damages for failure to provide certain information on request], or
>>
>> "(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> "(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

9

> "(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]"

ERISA §502(a)(1)-(3); 29 U.S.C. § 1132 (a)(1)-(3).

The Supreme Court has held that while beneficiaries or participants may not bring a direct breach of fiduciary duty claim under Section 1132(a)(2), they may bring such claims for their direct benefit under either Section 1132(a)(1)(B) or Section 1132(a)(3). The Court in *Varity Corp. v. Howe*, held that:

> "ERISA § 502(a)(3) authorizes lawsuits for individualized equitable relief for breach of fiduciary obligations. This Court's decision in *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S. Ct. 3085, 87 L.Ed.2d 96, that § 502(a)(2) - which permits actions 'for appropriate relief under § 409' - does not provide individual relief does not mean that such relief is not 'appropriate' under subsection (3) * * * Granting individual relief is also consistent with ERISA's language, structure, and purpose. Subsection (3)'s language is broad enough to cover individual relief for breach of a fiduciary obligation, and other statutory language supports this conclusion. Nothing in ERISA's structure indicates that Congress intended § 409 to contain the exclusive set of remedies for every kind of fiduciary breach."

516 U.S. 489 (1996) (syllabus 3). Further, the Court concluded that a beneficiary could bring a direct action for breach of fiduciary duty under Section 1132(a)(1)(B):

> "ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims, one that is outside the framework of the *second* subsection and cross-referenced § 409, and one that runs directly to the injured beneficiary. § 502(a)(1)(B)."

*Id*. at 512.

Even the case relied upon by defendants suggests that a direct claim for breach of fiduciary duty may be brought under Section 1132(a)(1)(B):

> "The alleged breaches of fiduciary duty here may be relevant to plaintiffs' claim in Count One to recover individual benefits under § 1132(a)(1)(B) * * * 'The proper remedy for breaches of fiduciary duty that take the form of denials of plan benefits is therefore a suit under § 1132(a)(1)(B).'"

*Adams v. Anheuser-Busch Companies, Inc.*, No. 2:10-CV-826, 2011 WL 1559793, at *7 (S.D. Ohio April 25, 2011).

In the case at hand, there is no doubt that plaintiff satisfies the requirements under ERISA §502(a)(3). Namely, plaintiff is a "participant" or "beneficiary" of the plan. Plaintiff is suing for "equitable" relief to "redress" a violation of ERISA §404(a), which is a "provision" of ERISA. It follows, that plaintiff has standing under Section 502(a)(3) to seek relief for defendants' breach of fiduciary obligations.

Perhaps realizing a deficiency in their standing argument, defendants also contend that the actual adoption of the Eighth Amendment, eliminating the RIF benefits, did not amount to a breach of their fiduciary duties. In support of their argument, defendants' assert that their decision to amend the terms of the plan was a business decision, not a fiduciary one.

ERISA sets forth that a person acts as a fiduciary with respect to a plan, and therefore is subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management" of the plan, or "has any discretionary authority or discretionary responsibility in the administration" of the plan. ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A). Accordingly, courts have typically distinguished between employer/sponsor acts that are related to "managing" and "administering" a plan, and those that are merely said to be "business decisions" that have an effect on the ERISA plan; the former being deemed "fiduciary acts" and the latter not. *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998). Typically, courts have established that an employer/sponsor does not act in a fiduciary capacity when it decides to amend or terminate a benefit plan. *Id*.

The *Sengpiel* decision, however, also made clear that certain actions taken in implementing a business decision that is itself not a fiduciary action, may give rise to fiduciary duties. *Id*. at 666. "It is true that certain actions taken in the course of implementing a corporate business decision may be subject to ERISA's fiduciary standards even though the employer's

decision itself is not." *Id*. *Sengpiel* cited to *Varity Corp.*, supra, as an example of how a sponsor acts in a fiduciary capacity in carrying out a business decision:

> "The Supreme Court has held, for example, that an employer acts in a fiduciary capacity when it intentionally misleads employees about the consequences of transferring their welfare benefit plans to a new entity created by a spin-off. * * * Drawing from the law of trusts, the Court [in *Varity*] concluded that 'conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of power appropriate to carrying out an important plan purpose.'"

*Id*.

In the case at bar, OI on more than one occasion assured plaintiff that the amendment would have no bearing on his ability to collect the RIF benefits promised to him by the Letter Agreement. Plaintiff, no doubt, relied on those assurances in deciding to remain employed with OI even after the implementation of the Eighth Amendment. These repeated assurances, coupled with the implementation of the cutback amendment, are certainly discretionary acts of plan management or administration which are subject to ERISA's fiduciary standards. At the very least, a jury should be given the opportunity to determine whether it constitutes "management" or "administration" of the plan, giving rise to fiduciary obligations, or merely a "business decision" that has an effect on an ERISA plan not subject to fiduciary standards.

C. OI Violated Its Fiduciary Duties by Deceptively Misleading Plaintiff Regarding His Expected Benefits.

Defendants once again rely on their standing argument for the proposition that plaintiff's third claim for breach of fiduciary duty lacks merit. For the reasons stated above, this argument must fail. ERISA statutes and case law specifically provides that a plan beneficiary or participant may bring an individual claim for equitable relief to redress "any act or practice which violates any provision" of ERISA. *Varity*, supra, at syllabus 3; 29 U.S.C. §1132(a)(3). Moreover, plaintiff has a right to recover benefits due to him in accordance with 29 U.S.C. §1132(a)(1)(B).[5]

---

[5]The Second Amended Complaint merely states that the cause of action arises under ERISA §502(a), 29 U.S.C. §1132(a). It does not specify any subsection of that provision. [Second Amended

Section 404 of ERISA imposes "an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in doing so, to act as a prudent person would act in a similar situation." *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 946 (6th Cir. 1990), quoting *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984); see also 29 U.S.C. §1104(a)(1). Accordingly, to knowingly deceive a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act "with a single-minded devotion to a plan's participants and beneficiaries." See *Varity* at 506. Courts have consistently held that lying is inconsistent with the duty of loyalty owed by fiduciaries under section 404(a)(1) of ERISA. *Id.*; See also *Bowman v. Gruel Mills Nims & Plyman, LLP*, No. 5:06-CV-87, 2007 WL 1203580, at *10 (W.D. Mich. April 24, 2007) (holding that an ERISA fiduciary may not materially mislead beneficiaries); *Asgaard v. Pension Committee*, No. 2:06-CV- 063, 2006 WL 2948074, at *9 (W.D. Mich. Oct. 13, 2006) (holding that an employer or plan administrator fails to discharge its fiduciary duty to act solely in the interest of the plan participants and beneficiaries when it provides materially misleading information, regardless if the fiduciary's statement was made intentionally or negligently).

In this case, OI by its December 28, 2004 letter assured plaintiff in writing that he was entitled to the enhanced RIF benefits as promised in the Letter Agreement. In that same writing, OI assured plaintiff that his entitlement to the enhanced RIF benefit would not be affected by the Eighth Amendment. OI knew these statements were false and misleading at the time it made these misrepresentations to plaintiff. It also knew that plaintiff was likely to rely upon the misrepresentation, which in fact he did. By failing to accurately inform plaintiff about the effect of the Eighth Amendment, defendants' breached their fiduciary obligations to act solely in the interest of plaintiff.

The fact that defendants' now contend that they "mistakenly informed" plaintiff that he did not need to retire prior to the amendment becoming effective makes no difference under the

---

Complaint, ¶1.]

law. [Memorandum in Support at 6.] A fiduciary breaches its obligations under Section 404 of ERISA when it materially misleads a participant or beneficiary regardless of whether the misrepresentation was made intentionally or not. See *Asgaard*, supra at *9.

  D.  <u>Plaintiff's Claim for Fraud Is Not Preempted by ERISA</u>

There is no doubt that ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." ERISA §514(a), 29 U.S.C. §1144(a). However, the sixth circuit has refused to conclude that state-law claims are preempted where their effect on the employee benefit plan is merely tenuous, remote or peripheral. *Marks v. Newcourt Credit Group*, 342 F.3d 444, 452 (6th Cir. 2003). For example, a state law claim only peripherally affects a plan where a plaintiff references plan benefits as a way to articulate specific, ascertainable damages. *Id*. at 452-453.

In *Marks*, a former employee sued his employer after his claim under a severance plan was rejected by plan administrators. The employee filed state law claims and ERISA claims alleging, among other things, that his employer had fraudulently induced him to (a) accept employment as an initial matter; and (b) to not exercise his rights under the plan. *Id*. at 449-450. The sixth circuit, in analyzing the claims, clearly differentiated between the two fraud claims for purposes of ERISA preemption, noting that:

> "Marks's fraud and misrepresentation claims are not entirely preempted, even though they clearly relate to ERISA insofar as they allege that Newcourt's conduct induced Marks 'not [to] exercise his rights under the AT & T Plan until May, 1999.' * * * To the extent that Marks alleges that fraud or misrepresentation induced him to accept employment as an initial matter, he can state a state-law claim for fraud and/or innocent misrepresentation. * * * These allegations clearly do not relate to an ERISA plan."

*Id*. at 453.

Here, similar to *Marks*, plaintiff's fraud claim does not arise directly from the plan, but rather from OI's inducement to have plaintiff remain an employee of the company even after the Eighth Amendment became effective. The fraud claim specifically says "Owens-Illinois deceptively induced plaintiff *to refrain from retiring* on December 31, 2004 by misrepresenting the effect that

14

the Eighth Amendment to the Plan would have on plaintiff's enhanced RIF benefits." [Second Amended Complaint, ¶37.] (emphasis added). The fact that plaintiff has referenced the plan as a way to articulate his damages does not mean that the fraud claim relates to the plan. Accordingly, plaintiff's fraud claim is not preempted by ERISA.

> E. <u>Plaintiff Has Satisfied All the Elements of an ERISA Equitable Estoppel Claim and Therefore His Claim Is Not Without Merit.</u>
>
> As noted by defendants, the elements of an ERISA equitable estoppel claim are:
>
> "1) conduct or language amounting to a representation of material fact;
>
> 2) awareness of the true facts by the party to be estopped;
>
> 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;
>
> 4) unawareness of the true facts by the party asserting the estoppel; and
>
> 5) detrimental and justifiable reliance by the party asserting estoppel on the representation."

*Tr. of Michigan Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000); *Julia v. Bridgestone/Firestone, Inc.*, 101 Fed. Appx. 27, 32 (6th Cir. 2004).

Defendants allege that plaintiff cannot prove either the second or the third element. [Memorandum in Support at 17.][6] It may be semantics, but does OI now contend that it did not know what the plain langauge of its Eighth Amendment said? Can it credibly contend that the unambiguous language that it adopted was not understood by its board which enacted it and the officers which recommended it? To suggest that this element cannot be proven simply ignores the underlying facts and circumstances completely.

---

[6]Defendants also conclude that plaintiff cannot support either the second or third elements of an equitable estoppel claim but fail to offer any basis or reasoning for their statement. Moreover, Danny Pennywitt has testified that the OI executive subscribing the December 2004 letter did in fact know that the amended plan did not permit what the December 2004 letter promised. [Pennywitt Dep. at 41-42; 61, 68.]

15

Further, the record evidence unambiguously demonstrates that plaintiff's reliance on OI's misrepresentations was justified. For instance, when plaintiff learned of OI's intention to amend the plan he sought assurances from the company that his Letter Agreement would not be affected. On December 28, 2004, Ford received a letter from OI that explicitly assured him that he would be paid the RIF benefits notwithstanding the January 1, 2005 amendment. Even after the amendment became effective, OI again assured Ford that he would receive the enhanced retirement benefits upon retirement. OI's former Director of Compensation Benefits, Danny Pennywitt, testified at deposition that a person in Ford's position that had received the documents that Ford had received, would have believed himself entitled to a tax advantaged distribution. There is no doubt that Ford reasonably relied on the assurances of OI in deciding to remain employed with OI beyond December 31, 2004.

Pennywitt himself conceded that it was prudent for Ford to have inquired about the impact of the Salaried Retirement Plan amendment on the Letter Agreement, but that the information that he received was simply not true. [Pennywitt Dep. at 67-68.] Equally as important, Pennywitt acknowledged that one receiving the documents that Ford had received would have believed himself entitled to a tax advantaged distribution, [Pennywitt Dep. at 68-69], and that that was, in fact, the very purpose of the December 28, 2004 memorandum. [Pennywitt Dep. at 65.]

Defendants, while completely ignoring the facts of the case, instead rely on Sixth Circuit precedent for the proposition that a party's reliance on a misrepresentation cannot be reasonable or justifiable if it is inconsistent with the plain and unambiguous terms of plan documents. This argument fails, however, because the Sixth Circuit has since held that "a plaintiff can evoke equitable estoppel in the case of unambiguous pension plan provisions where the plaintiff can demonstrate the traditional elements of estoppel * * * plus (1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Bloemaker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 444 (6th Cir. 2010). In

applying the new rule, the court expressly rejected the argument that applying estoppel in the face of plain and unambiguous plan provisions would lead to the enforcement of something other than plan provisions and instead held that enforcement of something other than plan documents based on estoppel is permitted under appropriate circumstances. *Id*. at 443-444.

Here, plaintiff has satisfied all the traditional elements of ERISA estoppel, plus the added requirements set forth by the sixth circuit in *Bloemaker*. There was a writing, in fact multiple writings, representing that Ford would receive the RIF enhancement; Ford was not capable of calculating the benefit owed him given the complexity of the plan; and the circumstances of the case are extraordinary. Ford would have retired and collected the RIF benefits prior to the Eighth Amendment becoming effective but for the misrepresentations made by OI. Accordingly, plaintiff has proven sufficient facts to avoid judgment as a matter of law.

## IV. CONCLUSION

Upon the facts presented, particularly that this case involves repeated misrepresentations by ERISA fiduciaries and the unlawful elimination of ERISA benefits, Mr. Ford is entitled under the law to proceed upon his claim. Given that all the facts must be construed in the light most strongly in his favor, it is evident that defendants have failed to show that no genuine disputes of fact exist, or that they are entitled to judgment as a matter of law. Accordingly, defendants' motion for summary judgment should be denied.

| Of Counsel for Plaintiff: | /s/ John J. McHugh, III |
|---|---|
|  | John J. McHugh, III (0019750) |
| McHUGH & McCARTHY, LTD. | Email: mchugh@mchughlaw.com |
| 5580 Monroe Street |  |
| Sylvania, Ohio 43560 | /s/ Matthew P. Waigand |
|  | Matthew P. Waigand (0087716) |
|  | Email: waigand@mchughlaw.com |
|  | 5580 Monroe Street |
|  | Sylvania, Ohio 43560-2538 |
|  | Telephone: (419) 885-3597 |
|  | Facsimile: (419) 885-3861 |
|  | Attorney for Plaintiff |

CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATIONS

This is to certify that this case has been assigned to the standard track and that the above Memorandum in Opposition meets the 20-page limitation applicable to standard track dispositive motion briefing.

/s/ John J. McHugh, III
An Attorney for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of August, 2012, a copy of the foregoing Memorandum in Opposition to defendants' Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ John J. McHugh, III
An Attorney for Plaintiff